**THE HONORABLE JOHN C. COUGHENOUR**

1
2
3
4
5
6
7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8
AT SEATTLE

9  UNITED STATES OF AMERICA,

10              Plaintiff,

No.:  2:16-CR-00062-JCC

11      v.

12  ANGELAKOS (HELLAS) S.A., GALLIA
GRAECA SHIPPING LTD., KONSTANTINOS
CHRYSOVERGIS, and TRYFON ANGELOU,

**ANGELAKOS (HELLAS) S.A. AND
GALLIA GRAECA SHIPPING
LTD.'S MEMORANDUM IN AID OF
SENTENCING AND OBJECTION
TO PRESENTENCE REPORT**

13              Defendants.

14

15      **COME NOW**, Angelakos (Hellas) S.A. ("Angelakos") and Gallia Graeca Shipping Ltd.

16  ("GGS") (collectively "organizational defendants")[1], by and through undersigned counsel,

17  and file this Memorandum in Aid of Sentencing and Objection to Presentence Report dated

18  October 7, 2016 (hereinafter referred to as Revised PSR).  In support thereof, organizational

19  defendants would respectfully show the Court as follows:

20                      **PRELIMINARY STATEMENT**

21      On June 20, 2016, the jury found Angelakos and GGS (*i.e.* – the operator and owner of

22  the M/V GALLIA GRAECA, respectively), each guilty of three (3) counts.  Specifically, the

23

24  ---
[1] It is respectfully submitted that during trial, the government repeatedly argued to the jury that Angelakos
(Hellas) Pte. Ld. and Gallia Graeca Shipping Ltd. should be treated as one (1) entity for the purpose of
determining criminal vicarious liability. It is respectfully submitted that in fashioning an appropriate sentence,
the Court should group Angelakos and GGS together, as otherwise the government will have an impermissible
"double dip" at sentencing by seeking to invoke two (2) fines for the exact same substantive conduct.  Such a
result is analogous to improperly charging the same offense multiple times.  *See* 1 C. Wright, *Federal Practice
and Procedure*, § 142 at 469 (1982); *United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989).

25

26

SENTENCING MEMORANDUM - 1
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

jury found the organizational defendants <u>vicariously</u> criminally liable for the otherwise unknown, unwanted, and unauthorized misconduct of the M/V GALLIA GRAECA's Chief Engineer Konstantinos Chrysovergis and Second Engineer Tryfon Angelou, causing the Master to fail to maintain an accurate Oil Record Book while in U.S. waters in violation of 33 U.S.C. § 1908(a) and 18 U.S.C. § 2; 18 U.S.C. § 1519; and 18 U.S.C. § 1001(a)(1). The relevant guideline section for 33 U.S.C. § 1908 is U.S.S.G. §2Q1.3 and the relevant guideline section for violations of 18 U.S.C. § 1519 and 18 U.S.C. § 1001(a)(1) is U.S.S.G. § 2J1.2. For each of these offenses, the maximum possible penalties that may be imposed on the organizational defendants are: (1) a fine of not more than USD 500,000; (2) a term of probation of up to five (5) years; and (3) a special mandatory assessment of USD 400.   No sentencing court has ever imposed a maximum fine in any similar matter.  Indeed, no sentencing court has ever come close under any similar set of facts or circumstances.   Similarly, no court has sentenced a vessel operator and owner separately.

It is respectfully submitted that a minimal fine, if any, is warranted in this case, once the Court considers *inter alia*, the fact that the organizational defendants are first time offenders[2] with a long and distinguished history and record as law abiding companies; that the organizational defendants took and have taken proactive steps to strengthen their environmental compliance programs; the Sentencing Guidelines; and the applicable provisions of 18 U.S.C. § 3553 and 18 U.S.C. § 3572.

## FACTUAL BACKGROUND

### A.   ANGELAKOS (HELLAS) S.A.

Angelakos (Hellas) S.A. is a Panamanian Corporation, which conducts business from its principal office located at 3, Aristeidi Moraitini Street, Palaio Faliro, 175 61 Athens, Greece.

---

[2] Organizational defendants have never previously been charged or convicted of any criminal offense, and are a "first time offender," which is an important mitigating factor in the determination of an appropriate sentence. *See United States v. Sheffer*, 896 F.2d 842, 845 (4th Cir. 1990) (approving the District Court's taking into account the defendant's status as a "first time offender" in imposing a less severe sentence).

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

Angelakos provides commercial and technical ship management services to clients which own ocean-going cargo vessels; one of which being the GGS and its sole asset, the M/V GALLIA GRAECA.  Currently, Angelakos manages a modern fleet of eleven (11) vessels.

In exchange for the services it provides to its clients, Angelakos earns a modest fixed management fee of USD 240,000 per year per vessel.  Angelakos employs thirty-two (32) shore-side employees within a variety of disciplines, who have on average twenty (20) years of experience in international shipping.  The departments include Quality/Safety/Security; Chartering; Technical; Crew; Operations; Purchasing; Marine; and Accounting. *See* Exhibit 7, p. 8.

As for its financial condition, Angelakos suffered a net loss of USD 67,561 for the year ending 2015.  Through June 30, 2016, the company had a net loss of USD 2,964.  *See* Exhibit 7, p. 8.

**B.      GALLIA GRAECA SHIPPING LTD.**

GGS is a ship owning company duly incorporated on May 8, 2001, in Cyprus.  GGS is the registered owner of the M/V GALLIA GRAECA and is the holder of the vessel's Certificate of Financial Responsibility.[3]   The GALLIA GRAECA is the sole asset of GGS. Since her delivery from the shipyard, the vessel has completed over three-hundred-seventeen (317) port calls carrying a variety of agricultural products around the world as well as iron ore, bauxite, and alumina for various unrelated third party charterers and cargo consignees.  At all relevant times, GGS employs shipboard crew of approximately twenty-one (21) seafarers.

As set forth in the attached income statement (Exhibit 8, p. 20), GGS suffered a net loss of USD 2,001,517 for the year ending 2015 and through June 30, 2016 had a net loss of USD 1,608,913. It is undisputed and indisputable that global bulk shipping markets have been deeply depressed and have led to significant contraction in the industry.

---

[3] COFR is a program administered by the National Pollution Funds Center which issues a certificate to a vessel owner upon the showing of an ability to pay cleanup or damage costs up to the liability limits required by the Oil Pollution Act. *See* http://www.uscg.mil/ccs/NPFC/About_NPFC/vessel_certification.asp., last accessed October 8, 2016.

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

**C.     THE VESSEL**

The M/V GALLIA GRAECA is a 39,035 gross ton bulk carrier built in 2001. The vessel is owned by GGS and has been managed by Angelakos since September 2001. The vessel is registered and operates under the sovereign or Flag State authority of the Cyprus Maritime Authority.  At all relevant times, the vessel has been "in Class" or otherwise been certified by the world's leading classification society: Lloyd's Register. *See* Dolan Testimony, as Exhibit 5, pp. 5:16-20; 61:4-6. Vessel's such as the M/V GALLIA GRAECA operate pursuant to various international and local port state rules as they sail around the world for various charter customers and/or cargo consignees.

**D.     EVIDENCE AT TRIAL**

GGS as owner and Angelakos as manager were charged and vicariously convicted for the unknown, unauthorized, and unwanted misconduct of Chief Engineer Chrysovergis (a first time employee on the GALLIA GRAECA and/or any other ship operated by Angelakos) and Second Engineer Angelou.  The misconduct at issue is alleged to have occurred on one, and possibly two, unknown times on a single voyage from China to Seattle.  Their misconduct was carefully hidden by the individual defendants from Captain Kapakis, as well as the nineteen (19) other crewmembers who lived and worked onboard the vessel during the voyage, and the shore-side team at Angelakos who monitored the vessel's day-to-day operations.  The offense conduct at issue is limited to the recordkeeping associated with the movement and processing of bilge water; all of which being required to be recorded in a shipboard log known as an Oil Record Book ("ORB").[4]

The ORB is a log for which the Captain, the head of the deck department and person in charge of the vessel is obliged to ensure that the book is maintained and all entries are correct.[5]

---

[4] Here, the specific allegations relate to a failure to record one, possibly two, discharges of bilge water. Said another way, the failure was one of omission, not one of commission. Even assuming a discharge of untreated bilge water occurred, the Chief Engineer and/or Second Engineer could and should have made a simple corresponding entry in the ORB.  Had they done so, there would be no U.S. crime.

[5] *United States v. Fafalios*, 817 F.3d 155 (5th Cir. 2016).

SENTENCING MEMORANDUM - 4
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

It is the Captain's responsibility to satisfy himself that all entries are timely and accurately made and that no required entries are omitted before certifying each page is accurate with his signature. The Court heard from Captain Kapakis who testified clearly, credibly, and undoubtedly: that he would not have permitted any crewmembers to knowingly make false entries into the oil record book, nor would he have provided the oil record book to the Coast Guard if he suspected that any required entry was purposefully omitted. *See* Exhibit 1, 183:2-13. Much like the organizational defendants, Captain Kapakis trusted the engineers to do their jobs properly and legally, and to report to him any conditions which affected their ability to do so. *See* Exhibit 1, 243:10-17. Captain Kapakis further testified that neither he, nor anybody from Angelakos nor GGS, would permit any of the engineers to cheat, lie, take a shortcut or otherwise omit any required entries from the vessel's oil record book. *See* Exhibit 1, 248:15-22.[6] Parenthetically, even if an improper discharge was performed, simply writing the information in the ORB would serve as a bar to any criminal prosecution in this Court.

The systems onboard the GALLIA GRAECA had a built in "check and balance system" requiring both members of the engine and deck department to ensure the ORB has been accurately maintained, with a view towards ensuring all pollution prevention laws and company rules were strictly adhered to. Indeed, Captain Kapakis testified that environmental protection was among the highest priority for the vessel. *See* Exhibit 1, 166:23 – 167:7. Third Engineer, Elmer DeVera, confirmed that Captain Kapakis reminded the crew of the expectation that they all follow the ship's pollution prevention policies as set out in the Angelakos' Environmental Management System as condition of their employment. *See* Exhibit 4, 70:12-16.   Captain Kapakis stated that if a crewmember is asked to participate in an improper or illegal act, he

---

[6] Captain Kapakis testified that not only did he routinely ask the Chief Engineer, Konstantinos Chrysovergis, whether the entries in the oil record book were accurate, but also instructed the Chief Engineer to double-check the entries to ensure compliance with IMO standards. *See* Exhibit 1, 171:16-25. In turn, the Chief Engineer repeatedly assured Captain Kapakis that the entries in the oil record book were accurate. Based upon the nature, substance, and tone of their discussions, Captain Kapakis believed the Chief Engineer was telling the truth. *See* Exhibit 1, 172:1-19.

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

expected the crew to report the conduct to him, *see* Exhibit 1, 157:3-19, which no crewmember did. *See also* Exhibit 1, 158:1-4.  Crewmembers Elmer DeVera, Almar Catenza, and Laurence Biascan each consistently and independently testified that they fully understood their duty to report any illegal or improper behavior.  *See* Exhibit 2, 74:22 – 75:7; *see* Exhibit 3, 56:7-10; *see* Exhibit 4, 54:21 – 55:20.

Third Engineer, Elmer DeVera, stated that the Second Engineer, Angelou Tryfon, never asked him to break any of the rules he learned prior to working onboard the vessel. *See* Exhibit 4, 56:6-10. The Third Engineer as well as the Electrician, Laurence Biascan, worked in the engine room every day and neither ever saw Mr. Angelou or any other crew member operate the oil water separator improperly. *See* Exhibit 4, 58:13-16; *See* Exhibit 2, 102:14-17; 103:1-7. Moreover, Almar Catenza, the Oiler, testified that it was made clear to him that nobody onboard the GALLIA GRAECA would ever be permitted to pump bilge water directly into the sea. *See* Exhibit 3, 75:24 – 76:2.

Crewmembers Elmer De Vera, Laurence Biascan, and Almar Catenza confirmed that no crew members were ever asked to keep secrets, or to lie to the Coast Guard. *See* Exhibit 4, 71:17-72:1; 72:17-23; *See* Exhibit 2, 110:23 – 111:13; *See* Exhibit 3, 101:15 – 103:3. Indeed, it was clear that, as a condition of their employment on the GALLIA GRAECA, each crew member was expected to always tell the truth.

E. **ANGELAKOS AND GGS HAVE A LONG HISTORY OF EFFECTIVE ENVIRONMENTAL COMPLIANCE**

The M/V GALLIA GRAECA has sailed around the world for over thirteen (13) years without ever running afoul of any law in any jurisdiction. As set forth in the presentence reports, both GGS and Angelakos have a historical track record devoid of any MARPOL/APPS related claim or litigation.  *See* Angelakos Revised PSR, at pp. 9-10.  The port state control report data submitted to the Probation Office (and subsequently presented to the Court in the Revised PSR) demonstrates that Angelakos-managed vessels have sailed and continue to sail world-wide with

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1   a very low incident rate of any operational deficiencies; even minor ones, despite operating at

2   sea in what can be very difficult and challenging conditions.  The GALLIA GRAECA has

3   participated in many USCG inspections during her service.  Notably, there has never been a

4   prior deficiency found by the USCG, let alone a MARPOL related deficiency noted by the

5   Coast Guard. *See* Gallia Graeca Revised PSR, at p. 9.  Indeed, this exact vessel (and crew)

6   participated in an examination by the Washington Department of Ecology on or about

7   November 4, 2015 at which time the inspector remarked "Very good efforts to comply for this

8   14 yr old infrequent caller. Found WAC bunker info forwarded from [other Angelakos'

9   managed] vessel on board. Good discussions with Master and C/E, both Greek."

10  *See* Exhibit 10.

## ARGUMENT

### I.    THE STATUTORY MAXIMUM SENTENCE

13          The Probation Office reports that the government is going to ask for the maximum

14  penalty to be imposed.   Without any meaningful analysis, the probation department has

15  endorsed the request. Angelakos and GGS Revised PSR, p. 1; *see also* proposed Judgment.

16  The statutory maximum that may be imposed against Angelakos and GGS for each of the three

17  counts of conviction, before grouping and appropriate adjustment, are: (i) a fine of no more than

18  $500,000[7]; (ii) no more than five years' probation; and (iii) a special mandatory assessment of

19  $400 per count. *See* Revised PSR, p. 1.  Again, no sentencing court has ever imposed a

---

[7] *See* 18 U.S.C. § 3571(c)(3). Unquestionably, 18 U.S.C. § 3571(d) would have allowed the Court to impose a fine based on twice the "pecuniary gain from the offense" or twice the "pecuniary loss to a person other than the defendant," but the government did not introduce any evidence quantifying such an amount during trial, and the jury was not directed to make any such determination. In *Southern Union Co. v. United States*, the Supreme Court held that the rule of *Apprendi*—that a jury must find any fact that increases the statutory maximum sentence—applies to fines imposed against organizational defendants. *See* 132 S. Ct. 2344, 2350 (2012). Based on this ruling, the jury would have been required to find any fact that would increase the statutory maximum fine imposed against DSD, including any amount used under the "federal twice-the-gain-or-loss statute." *Id*. at 2351-52 (citing 18 U.S.C. § 3571(d)). In short, because the government failed to elicit any such factual finding from the jury here, the Court may not impose a fine in excess of the $500,000 maximum for each count, which is the maximum established under 18 U.S.C. § 3571(c)(3). *See also United States v. Bane*, 720 F.3d 818, 830 (11th Cir. 2013) (holding that a fine in excess of the statutory-set maximum for individuals in 18 U.S.C. § 3571(b)(3) could not be imposed under 18 U.S.C. § 3571(d) because the fine was "without a jury finding" and therefore constitutionally impermissible under *Southern Union*).

SENTENCING MEMORANDUM - 7
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1  maximum fine in a vicarious MARPOL matter arising from unknown prohibited conduct on a

2  single voyage on a vessel owned and operated by companies with no criminal history.

3  **II.       THE SENTENCING GUIDELINES**

4          The relevant guideline section for a violation of 33 U.S.C. § 1908 is U.S.S.G. §2Q1.3

5  and the relevant guideline section for violations of 18 U.S.C. § 1519 and 18 U.S.C. § 1001(a)(1)

6  is U.S.S.G. § 2J1.2. U.S.S.G. Chapter Eight applies to the sentencing of all organizations

7  convicted of felony offenses. *See* U.S.S.G. § 8A1.1. With respect to a determination of a fine,

8  U.S.S.G. § 8A1.2(b)(2) provides that U.S.S.G. § 8C2.1 is to be applied to identify the counts

9  for which provisions U.S.S.G. §§ 8C2.2 through 8C2.9 apply. The rules for calculating the fine

10 range in §§8C2.2 through 8C2.9 are limited to specifically enumerated offenses listed in

11 U.S.S.G. §8C2.1. However, neither U.S.S.G. §2Q1.3, nor U.S.S.G. § 2J1.2, are covered under

12 U.S.S.G. § 8C2.1. For those counts which the applicable guideline is not enumerated in

13 U.S.S.G. §8C2.1, the provisions of U.S.S.G. § 8C2.10 are to be applied in the determination of

14 the fine amount. That guideline section provides that the Court should determine an appropriate

15 fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572 and the various factors

16 contained therein. Accordingly, Organizational Defendants detail (below) the relevant factors

17 set forth in those sections that the Court is required to consider in determining an appropriate

18 and reasonable sentence for the organizational defendants.

19 **III.      THE STATUTORY SENTENCING FACTORS**

20         The sentence to be imposed upon the Organizational Defendants must be consistent with

21 the requirements of sections 3553 and 3572 of Title 18.  The guiding principle is that the fine

22 shall be "sufficient, but not greater than necessary, to comply with the purposes set forth in

23 paragraph (2) of [section 3553(s)]."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007);

24 *see also* 18 U.S.C. § 3552(a).  The sentence must be the *minimum* sentence necessary to meet

25 the objectives. *Id.*   The government's request for a "maximum" fine is simply unjustified and

26 unwarranted under the facts and circumstances of this vicarious prosecution.

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1. **The Nature and Circumstances of the Offense and the Characteristics of the Defendants**

This case involves three (3) counts vicariously charging Angelakos and GGS for ostensibly the same underlying unknown, unwanted, and strictly prohibited misconduct onboard the M/V GALLIA GRAECA, which was purposefully hidden from the ship's Captain, other crew, and the organizational defendants.  The misconducted was abhorrent behavior from two (2) men with no prior criminal history and long, distinguished careers working at sea.  As confirmed by the testimony of the Coast Guard officers and third party auditors who attended on board the ship, the M/V GALLIA GRAECA was exceptionally well maintained.  As the Court learned at trial, the misconduct was limited to a single voyage from China to Seattle, Washington, <u>after</u> the vessel had undergone regularly scheduled maintenance on all relevant systems in the Engine Room and all had been found to be in good working order by both representatives of the organizational defendants and third party consultants.

Specific to the facts of this case, there were repeated tests on the vessel's Oily Water Separator system, including but not limited to, calibrations and inspections during the vessel's drydock service in China immediately before departing for Seattle.  The Lloyd's Register surveyor tested the Oil Content Meter, alarms, and OWS. Exhibit 6, 7:11-19.   Then the Angelakos' Technical Superintendent, Mr. Ioannis Baxevanis "washed"[8] the OWS. Ex. 6, 8:1-6. A manufacturer's technician took the Oil Content Meter to his workshop to calibrate and certify it prior to the vessel's departure from China.  *See* Exhibit 6, 8:22 – 9:8.  Finally once the vessel was back in the water after drydock and before sailing, the equipment was tested to ensure proper function and operation. Exhibit 6, 10:7 – 11:21; *see also* Exhibit 11, pp. 183-83 (MST1 Hamilton confirmed that he reviewed and found alarm records demonstrating that the Oily Water Separator had been tested and washed during the vessel's time in drydock).

---

[8] Washing the OWS, as per the makers' manual, includes flushing the OWS with water without opening the OWS itself. *See* Exhibit 6, at 10:7 – 11:21; 55:12-18; 57:18 – 58:4; and 78:5-8.

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

However, during the voyage, it appears the equipment must have become "fouled;" a condition which was not reported to the Master, the organizational defendants, and/or anyone else, including the U.S. Coast Guard and one which should have been immediately and easily rectified. The government's own witnesses MST1 Dan Hamilton and the government's engineering expert James Dolan both testified that cleaning these filters were easy parts of the engineers' regular and routine maintenance, which would take no more than five (5) minutes to clean the t-strainer and no more than thirty (30) minutes to clean the coalescer. Dolan Testimony, Exhibit 5, 9:3-8. The government's witnesses corroborated the testimony of the crewmembers that the organizational defendants ensured that there were more than sufficient spares onboard the vessel for the crew to use as necessary to maintain, repair, and/or replace the vessel's shipboard pollution prevention equipment at sea.

There was no evidence or testimony presented at trial that any unrecorded discharges of bilge waster occurred while the vessel was in U.S. waters. Because the M/V GALLIA GRAECA is a Cyprus flagged vessel, the laws of the Cyprus, as the flag state, apply to acts occurring on the high seas.[9] The United States has neither the authority nor the jurisdiction to prosecute a foreign-flagged vessel for improper discharges of bilge water on the high seas.[10] More to the point, any such acts cannot be considered relevant conduct for determining an appropriate sentence, as the counts of conviction relate to the conduct that occurred while the M/V GALLIA GRAECA was in U.S. waters.[11] None of the elements of the offenses for which

_____

[9] *See United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 307 (2d Cir. 2009) ("There are two pertinent limitations to the application of the APPS. First, [APPS] appl[ies] to U.S.-registered ships wherever they are (including beyond U.S. waters), but to any foreign-flagged ships only "while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States" …. Second, the APPS states that "[a]ny action taken under [the APPS] shall be taken in accordance with international law."); *see also* 33 U.S.C. § 1912; 33 C.F.R. § 151.09(a)(1)-(5); 33 U.S.C. § 1902(a)(2).

[10] "We conclude, therefore, that under the APPS and accompanying regulations, Congress and the Coast Guard created criminal liability for foreign vessels and personnel only for those substantive violations of MARPOL that occur in U.S. ports or waters. Stated differently, a MARPOL violation by such a vessel or its personnel is only an "offense" under U.S. law if that violation occurs within the boundaries of U.S. waters or within a U.S. port." *United States v. Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006).

[11] *Id.*

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1    organizational defendants were convicted related to any discharges in U.S. waters.  Instead, the

2    charges relate to record keeping offenses and actions that occurred during the vessel's call at

3    Seattle, Washington.

4         The Third Circuit Court of Appeals in *United States v. Abrogar*, 459 F.3d 430, 435-36

5    (3d Cir. 2006), has held that unrecorded discharges occurring aboard a foreign flagged vessel on

6    the high seas are not "relevant conduct" for the purposes of determining the appropriate

7    sentence in APPS related prosecutions. *See id*. at 436. Organizational defendants submit that

8    while evidence of such extraterritorial discharges was found to be relevant at trial, the offenses

9    for which organizational defendants stand convicted are limited to completely unnecessary and

10   unauthorized recordkeeping omissions (*i.e.* – the knowing failure to maintain an accurate ORB),

11   and conduct related to the Coast Guard's Port State Control inspection of the vessel.

12        Organizational Defendants are committed to a "zero tolerance policy" against pollution

13   of any kind, a position which is underscored and emphasized by a long history of compliance by

14   the M/V GALLIA GRAECA and the other vessels in the Angelakos-managed fleet.  *See* Points

15   A-E, *supra*.  All have regularly called at ports in the United States and continue to do so today,

16   without incident, but for this action.  This case is the first instance that the organizational

17   defendants have been involved in any type of criminal prosecution in their respective histories.

18   It is respectfully submitted that based on the track record of compliant lawful operations, the

19   acts of the Chief Engineer and Second Engineer constitute an isolated and anomalous incident,

20   which the Court need not fear to reoccur.

21        **2.    Seriousness of the Offense, Respect for Law and Just Punishment**

22        APPS is domestic law of limited applicability to foreign flagged vessels for acts

23   committed on the high seas. *See Abrogar*, *supra*.  A fair and reasonable sentence for an APPS

24   related violation should, therefore, be fashioned to reflect the nature of the offenses.

25        The facts in this case, as they relate to the organizational defendants, do not support a

26   maximum fine or anything even close thereto. All of the conduct that led to the convictions in

SENTENCING MEMORANDUM - 11
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

this case occurred aboard the M/V GALLIA GRAECA while it operated on the high seas during a single voyage. If convictions for record keeping APPS violation occurring in U.S. waters and related offenses involving a foreign flag vessel are somehow permitted to be transformed into punishment at sentencing for acts beyond the U.S., it would improperly and unjustifiably distort the MARPOL Treaty, the existing laws of the sea (including the principle of exclusive flag state jurisdiction), the principles of sovereignty and comity, and impermissibly transform the domestic APPS statute into an unintended and unauthorized one of extraterritorial, indeed, global reach.[12]   Such a result was never envisioned, nor intended, by any of the applicable maritime laws and treaties such as MARPOL, to which the United States and other seafaring nations are signatories.

Here, no corporate officer, director, or other member of shore-side management knew about (or could or should have known), and certainly did not condone, the recordkeeping omissions at issue. In fact, each of the crewmembers who testified at trial stated that they were well aware that Angelakos and GGS certainly would never condone or accept any intentional discharges of untreated bilge water and/or record falsifications to cover-up the same. *See* Exhibit 4, 71:17-72:1; 72:17-23; *See* Exhibit 2, 110:23 – 111:13; *See* Exhibit 3, 101:15 – 103:3.   It is common ground, that organizational defendants trained engineering shipboard staff members and demanded their complete compliance with a "zero-tolerance," anti-pollution policy and compliance with a strict reporting procedure.   A clear and well understood anti-retaliation policy was made clear to all crew.

\\

\\

_____

[12] *See* 33 C.F.R. §151.25; *see also U.S. v. Jho* 534 F. 3d 398, 403 (5th Cir. 2008) (holding, "[w]e read the requirement that the oil record book be 'maintained' as imposing a duty on a foreign-flagged vessel to ensure that it's oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States."); *see also United States v. Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006)(holding that pursuant to the APPS and accompanying regulations, Congress and the Coast Guard created liability for foreign vessels and personnel only for those substantive violations of MARPOL/APPS that occur in U.S. ports or waters).

SENTENCING MEMORANDUM - 12
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1

### 3.     Adequate Deterrence

2       Angelakos and GGS were required to enter into an "Agreement on Security" in order to

3   obtain the release of the vessel from its Customs' hold.  The Agreement on Security required

4   Angelakos and GGS to jointly and severally post a surety bond of USD 500,000 as security for

5   any potential fine or penalty, and to maintain in a hotel the seven (7) crewmembers of the M/V

6   GALLIA GRAECA who were detained in Seattle, pay a USD 40.00 per day per diem,

7   continued payment of the salaries of the detained crewmembers, pay for the medical care and

8   transportation for each crewmember, and pay for their repatriation.  The funding of the

9   government's prosecution through the terms of the Agreement on Security have caused the

10  organizational defendants to jointly and severally incur obligations of no less than $400,950.98.

11  Specifically, this significant sum, was incurred for the housing; feeding; maintenance; and

12  payment of "total wages" of the various crewmembers in Seattle during the course of the

13  investigation and prosecution (and not by the government), which serves as a substantial

14  deterrent[13] to organizational defendants and other ship owners and managers. It further serves

15  as encouragement to the shipping industry and vessel owners and operators to take all

16  necessary precautions to ensure that the crews serving aboard the ships they manage obey the

17  law, maintain accurate records and logs and fully cooperate with port state authorities, such as

18  the U.S. Coast Guard. Organizational defendants respectfully submit the Court should take into

19  consideration this $400,950.98 when determining the amount of a fine, if any, to be imposed in

20  this matter.

21  _____

22  [13] Furthermore, APPS related prosecutions and the sentences imposed on vessel owners and operators are
    widely reported in the maritime industry press and trade journals, as well by as mainstream media outlets in the
23  U.S. and other seafaring nations. In this regard, the U.S. Department of Justice routinely issues press releases for
    matters involving the criminal prosecution of vessel owners, operators, and crewmembers in MARPOL/APPS
24  related environmental enforcement cases, and all of these press releases are picked up and reported by both the
    maritime and mainstream press outlets.  *See, e.g.*, https://www.justice.gov/usao-wdwa/pr/shipping-companies-
25  and-engineers-indicted-concealing-oil-pollution (March 10, 2016); https://www.justice.gov/usao-wdwa/pr/ship-
    owner-operator-and-engineers-found-guilty-violating-pollution-laws-falsifying (June 20, 2016), last accessed
26  October 12, 2016.

SENTENCING MEMORANDUM - 13
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

**4.      Protecting the Public from Further Crimes of the Defendants**

There is no reason for the Court to fear future misconduct from organizational defendants and/or any of their agents or employees, as substantial remedial measures have been implemented, many of which have been reported to the Probation Office and included in the Revised PSR.  Angelakos and GGS immediately took action to implement measures to prevent reoccurrence of any similar event. In general, corrective measures enforced/to be enforced include the following:

The Safety Management System was extensively reviewed by the Quality and Safety department and duly amended as follows:

- Office Manual: March 2016.

- Deck Manual: March 2016.

- Safety Manual: March 2016.

- Engine Manual: March 2016, April 2016 and May 2016.

- Environmental Manual: March 2016 and July 2016.

- Crew Manual: March 2016 and April 2016.

The Angelakos Environmental Management System for the GALLIA GRAECA (and all other Angelakos-managed ships) has been checked, vetted, and audited by Bureau Veritas in accordance with International Standard ISO 14001:2004.   The Initial Environmental Management System Review took place on July 19th, 2016 *and* Main Audit on July 20th, 2016. The Certificate ISO 14001:2004 was issued on July 25th, 2016. *See* Exhibit 9.

Prior to enhancing its environmental management system to ISO 14001 certifications standards, Angelakos sought and implemented an Environmental Policy in 2013 to address best industry practices covering MARPOL regulations and promoting an environmentally friendly mentality, both ashore and on board. An Environmental Manual was issued to all vessels in 2013.

SENTENCING MEMORANDUM - 14
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

Now, the systems require much more robust reports and oversight obligations, including but not limited to:

- Daily reporting of Remaining On Board quantities on Sludge/Bilge Water.

- Reporting and monitoring of E/R Sounding Log with weeklies of Sounding Log and Oil Record Book.

- Reporting of shipboard staff for the use of the Oil Water Separator and/or the Incinerator.

- The Company is currently in the final stages of selecting candidates for the Quality and Safety department.

- Additional shore-based staff are being sought.

Additionally, the Court heard testimony of the vetting process for new crewmembers seeking employment onboard a vessel managed by Angelakos are required to attend training on the Safety Management System, Environmental Management System, and MARPOL training.[14] It is respectfully submitted that this proactive effort addresses this factor and further serves to protect the public from this type of conduct the future on the part of the organizational defendants.

**5**.      **Providing Needed Educational or Vocational Training, etc.**

Organizational defendants respectfully submit that section 3553(a)(2)(D) is not relevant to this matter.

**6.      The Kinds of Sentences Available**

Based upon the substance of the Revised PSR issued by the Probation Office, no punishment other than a fine and/or probation has been suggested.

\\

\\

---

[14] Both Chrysovergis and Angelou had what appeared to be unblemished records and long, distinguished careers at sea when hired to work onboard the GALLIA GRAECA.  It cannot be said there was any indication that either would break the law and/or fail to follow shipboard practices and/or procedures.

SENTENCING MEMORANDUM - 15
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### 7.      The Sentencing Guidelines

Organizational defendants suggested application of the sentencing guidelines is set forth above, which refers the Court to 18 U.S.C. 3553 and 18 U.S.C. 3572.

### 8.      Pertinent Policy Statements

Organizational defendants are not aware of any applicable policy statement of the Sentencing Commission.

### 9.      The Need to Avoid Unwarranted Sentencing Disparity among Defendants with Similar Records

It is axiomatic that defendants with similar backgrounds which have been found guilty of the same offenses should receive similar sentences. *See Dorsey v. United States,* 132 S. Ct. 2321, 2334 (2012); *see also United States v. Amaya*, 2013 U.S. App. LEXIS 6223 (4th Cir. 2013); 28 U.S.C. § 991(b)(1)(B) (stressing the need to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct"). Although this principle is expressed in 18 U.S.C. §3553(a)(6), it is referenced in this section of the Memorandum because the primary sentencing decision for the Court with respect to organizational defendants is the amount of any fines to be imposed for the counts of conviction.

In the <u>most</u> <u>similar</u> recent vessel MARPOL/APPS case, *United States v. Diana Shipping Services S.A.*, 2:13-cr-40 (E.D. Va. 2013), a first time offending ship manager was found vicariously criminally liable on eleven (11) counts in the Eastern District of Virginia. That matter involved a Chief Engineer, a Second Engineer, and a vessel operator, Diana Shipping, all of which went to trial and were found guilty of all eleven (11) counts charged. Similar to this case, the Chief Engineer and the Second Engineer did not testify in their own defense, yet persistently maintained their innocence throughout the matter.[15] In *Diana*, the

---

[15] This is a particularly awkward situation for an organizational defendant which finds itself in the unenviable position of being told by an agent or employee that they are innocent, but being pushed to accept responsibility for the unknown shipboard acts by the government prosecutor(s).  Especially in a case such as this where there is <u>no</u> crewmember stating that the misconduct actually occurred.  This situation is underscored by the adverse authority found in *United States v Mylonaki*s, 09-cr-492 (SDTX 2010) and the subsequent civil litigation

SENTENCING MEMORANDUM - 16
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

allegation concerned an alleged course of misconduct over three (3) months and involving a vessel making three (3) different U.S. port calls; whereas this case involved a single voyage covering well less than one (1) month and a single U.S. port call.  In weighing all of the sentencing factors and applicable guidance, District Judge Davis,[16] imposed a sentence of USD 100,000 per count for a total, aggregate fine of USD 1,100,000 (i.e. – USD 100,000 per count). Organizational defendants would respectfully submit that a similar aggregate fine of USD 100,000 per count (*i.e.* USD 300,000 in total for both organizational defendants), would be an appropriate maximum fine in this case.

### 10.   Restitution

Here, based upon the substance of the Revised PSR issued by the Probation Office, it appears to be common ground that there are no identifiable victims and therefore restitution is unnecessary and inappropriate in this action.

## IV.   SECTION 3572 FACTORS MUST ALSO BE CONSIDERED.

In addition to considering the factors set forth in 18 U.S.C. § 3553(a), the Court is also required to consider the factors set forth in 18 U.S.C. § 3572, to determine the appropriate fine for organizational defendants. These factors are as follows.

### 1.   Company's Size and Income

As reported to the Department of Probation, Angelakos is a modest business with thirty-two (32) employees, who assist in the management of the vessels belonging to its eleven (11) ship owning clients.  GGS has twenty-one (21) crewmember employees at any specific time that serve onboard the M/V GALLIA GRAECA. As set forth above, both organizational defendants

---

*Mylonakis v. MT GEORGIOS M, et al.*, 4:10-3031 (SDTX 2013), a case in which the organizational defendant pled guilty to an APPS violation and blamed Chief Engineer Mylonakis for the misconduct as part of the factual predicate for the plea and assisted the government in C/E Mylonakis' prosecution.  A Houston jury acquitted Chief Engineer Mylonakis of all five (5) counts.  Mr. Mylonakis subsequently sued the Owner and Operator, among others in a civil action which resulted in an out of court settlement.

[16] District Judge Davis is the most experienced APPS trial judge having presided over two (2) APPS criminal cases involving organizational defendants in 2013.  *United States v. Diana Shipping, supra*, and *United States v. Angelex Ltd., et al.* 13-cr-70 (EDVa. 2013) (in which the Owner and Operator were each acquitted of eight (8) felony counts, but the Chief Engineer was convicted of seven of the eight charges).

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1    have operated for the past year and a half at a loss due to market conditions, but remain

2    optimistic that the bulk shipping markets will sufficiently improve so as to allow the companies

3    to remain viable. *See* Exhibit 7 and 8.   Parenthetically, many shipping companies have gone

4    bankrupt and/or simply disappeared due to the industry recession. In accordance with the

5    requirements of the Agreement on Security, organizational defendants struggled, but did post a

6    surety bond in the amount of USD 500,000. Organizational defendants have significant ongoing

7    obligations related to this matter, which continue to burden the companies' respective and

8    individual resources and may threaten their future viability.

9
10
        **2.      No Pecuniary Loss Was Inflicted upon Others, Therefore No Restitution
                   Should Be Ordered**

11          As set forth in the Revised PSR, dated October 7, 2016, the convictions in this case did

12   not result in any pecuniary loss.   There were no identifiable victims.   Restitution is not

13   warranted in this matter.

14          **3.      Organizational Defendants Derived No Pecuniary Gain from The Offenses**

15          While Angelakos and GGS were held vicariously liable for the acts of Defendants

16   Chrysovergis and Angelou, their actions did not result in any pecuniary gain for organizational

17   defendants. Each of the witnesses who testified at trial confirmed that the M/V GALLIA

18   GRAECA had ample spare parts for the operation, maintenance, and required pollution control

19   equipment (*i.e.*, the incinerator, oily water separator, oil content meter and auxiliary boiler), and

20   a team of mechanics on board to do the necessary.   In addition, this vessel was specially

21   designed so that the oily water separator could be utilized to treat and discharge bilge water

22   generated by the vessel.   Organizational defendants placed no time or monetary restrictions on

23   the vessels' crew in what should or could be spent for compliance with all regulations, including

24   the amounts to be spent for treating, processing bilge water, and, when requested, discharging

25   waste ashore as done in China prior to sailing from the shipyard. Accordingly, there was simply

26

SENTENCING MEMORANDUM - 18
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1  no pecuniary gain recognized by organizational defendants as a result of the individual

2  defendants' conduct.

3  **4.     Disciplinary Actions Taken by Organizational Defendants**

4          Organizational defendants have already taken additional steps to ensure that no similar

5  MARPOL/APPS violation ever occurs again.  In addition to the proactive measures taken prior

6  to the jury's verdict discussed above, organizational defendants have made it clear to all

7  shoreside and shipboard staff that compliance with the Environmental Management System

8  policies and procedures, as well as, following all international laws, rules, and regulations is of

9  utmost importance.  Consistent with that approach, organizational defendants will continue to

10  review their vetting, training, and familiarization protocols in order to make sure that all staff are

11  familiar with and will comply with the proper operation of the vessel's Oily Water Separator,

12  Incinerator, and associated pollution prevention equipment.[17]

13  **V.     ADDITIONAL FACTORS TO BE CONSIDERED BY THE COURT.**

14          **1.     Defendants' Inability to Pay a Fine Should Be Considered by the Court**

15          A defendant's financial condition must be considered in determining the amount of a

16  fine.  *See* 18 U.S.C. § 3572(a)("In determining whether to impose a fine, . . ., the court shall

17  consider, . . . the defendant's income, earning capacity, and financial resources"); *see also*

18  U.S.S.G. § 8C3.3 (providing that the amount of a fine may be reduced if an organization is

19  unable to pay a guidelines range fine).  A court should impose a fine in an amount less than

20  otherwise would be required where "the court finds that the organization is not able, and even

21

22  [17] The Expected Cost of Monitoring Compliance during Probation is also a factor.  The government has asked
for the entry of an Environmental Compliance Plan, which organizational defendants believe is unwarranted

23  under the facts and circumstances of this matter.  See Point V, 2, infra. To the extent that the Court were to
impose an ECP, The Court's and Department of Probation's monitoring of organizational defendants'

24  compliance with probation, if an Environmental Compliance Plan is imposed, will need to be performed by an
independent expert through the appointment of a third party, Court Appointed Monitor (CAM), whose costs and

25  fees will be for the account of the organizational defendants.  It is respectfully submitted that, if the ECP is
imposed, these costs, fees, and expenses are properly to be considered as mitigation of any fine amount that

26  might be imposed by the Court.

SENTENCING MEMORANDUM - 19
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1  with the use of a reasonable installment schedule, is not likely to become able to pay the

2  maximum fine." *See* U.S.S.G. § 8C3.3(b).  For the purposes of the guidelines, an organization is

3  not able to pay the minimum fine, where, even with an installment schedule, "the payment of

4  that fine would substantially jeopardize the continued existence of the organization." *See*

5  U.S.S.G. § 8C3.3, Application Note 1.

6          When a court imposes a fine and determines "the amount, time for payment and method

7  of payment," the court must consider, *inter alia*, "the defendant's income, ensuring capacity and

8  financial resources." 18 U.S.C. § 3572(a)(1).  Indeed, U.S.S.G. § 8C3.3 permits "a court to

9  reduce a fine upon a finding that a defendant organization is not, and is not likely to

10  become, able to pay it." *United States v. Eureka Labs., Inc.*, 103 F.3d 908, 912 (9th Cir.

11  1996). The imposition of a fine so substantial that it wipes out a business organization

12  would itself be an abuse of discretion. S*ee Standard Oil Co. of Indiana v. United States*,

13  164 F. 376, 386-89 (7th Cir. 1908) ("[T]his is not the punishment of an unlawful

14  business, but the punishment of unlawful practices connected with a lawful business . . .

15  .").  As set forth in the enclosed financial documents, organizational defendants have

16  limited capabilities to pay a fine and it is respectfully requests that the Court bear this in

17  mind, as well as the organizations' other obligations to be met as a result of

18  Organizational Defendants' cooperation with the government.

19          2.        **The Counts Should Be Grouped**

20          In determining an appropriate fine, if any, to impose, the Court should group the three

21  (3) counts for the purposes of sentencing.  Grouping the counts for the purposes of determining

22  the fine, will adequately satisfy the enumerated statutory objectives and requirements of 18

23  U.S.C. §3553 and 18 U.S.C. §3572 and the Court's "overarching" duty to 'impose a sentence

24  sufficient, but not greater than necessary' to accomplish the goals of sentencing." *See*

25  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Pepper v. United States*, 131 S. Ct. 1229,

26  1242-43 (2011). "The Sentencing Commission wrote its grouping provisions 'with an eye

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1    toward eliminating unfair treatment that might result from count manipulation.' U.S.S.G. Ch. 1,

2    Pt. A, § 4(a)." *United States v. Calozza*, 125 F.3d 687 (9th Cir. 1997).

3          When a defendant is convicted of multiple counts, courts are required to determine

4    whether the counts arise from the same act or transactions and, therefore, "grouped" for the

5    purposes of sentencing. *See* U.S.S.G. §§ 1B1.1(d), 3D1.1(a), 3D1.2; *see also United States v.*

6    *Wessells*, 936 F.2d 165, 168 (4th Cir. 1991); *United States v. Patterson*, 962 F.2d 409, 417 (5th

7    Cir. 1992). Specifically, for counts involving the same acts or transactions connected by a

8    common scheme or plan, or which involve the same harm, grouping ensures convictions for

9    such acts will not result in the imposition of an inappropriately harsh sentence. *See* U.S.S.G. §

10   3D1.2(b); *see also Calozza*, 125 F.3d at 692. Accordingly, grouping seeks to ensure that

11   convictions on multiple counts do not result in a sentence enhancement unless the multiple

12   counts represent additional conduct that is not otherwise accounted for by the guidelines. *Id.*

13         For both Count One a violation of 33 U.S.C. § 1908(a) and Count two a violation of 18

14   U.S.C. § 1519, the organizational defendants were held vicariously liable for ostensibly the

15   same conduct, namely that the Oil Record Book was falsified by omission by shipboard staff.

16   *See* Doc. 4, pp. 6-7.  With the exception of the difference in the statutory language of each

17   count, the exact same underlying offense conduct was alleged in both counts and are a result of

18   maintenance and presentation of the inaccurate Oil Record Book to the Coast Guard during the

19   Port State Control Inspection in Seattle on or about November 6, 2015.  With respect to Count

20   Three, the allegation is that the Defendants engaged in a scheme to defraud the United States

21   hiding the fact that the Oily Water Separator had failed and that an unrecorded discharge of

22   bilge water followed, *i.e.* a recount of the same conduct specified in Counts One and Two.  *Id.*,

23   at pp. 8-9. Notably, neither individual defendant reported such failure to either the Master (or

24   Captain) and failed to report to the organizational defendants as they were obliged to do.  It is

25   respectfully submitted that it is appropriate for the Court to group the offense conduct for the

26   three (3) charges together when determining the proper amount of a fine, if any, to be imposed.

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1

## VI.   PROBATION

2        Organizational Defendants submit that if the Court were inclined to impose a

3  probationary sentence; no more than a two (2) year term of probation would be appropriate

4  under the circumstances of this case.  *See e.g. United States v. Petraia Maritime Ltd.,* 06-cr-91

5  (D. Me. 2007).  In *Petraia,* District Judge Singal ordered the organizational defendant manager

6  of a vessel who was found vicariously guilty of three (3) counts to serve a term of probation of

7  two (2) years and to be fined USD 525,00).  This term of probation will not only meet the

8  requisite needs of the Court to balance the applicable sentencing factors, but will also provide

9  sufficient time for the organizational defendants to evince continued good performance. *See also*

10  *U.S. v. Schlussel Reederei KG*, 04-cr-477 (D. Haw. 2005)(Two-year term of probation entered).

11  Accordingly, organizational defendants respectfully submit that no probation is warranted.

12  However, to the extent the Court may wish to impose some probationary term, it need not be

13  more than two (2) years of probation.

14  ## VII.   SPECIAL TERMS OF PROBATION – A FURTHER ECP IS NOT WARRANTED

15

16        While the government will request that the Court impose an ECP and cite to other

17  matters wherein similarly situated organizational defendant(s) have implemented similar

18  programs, it would be "a step backwards" to seek to impose a new system which may be

19  "different," but is not demonstratively "better."  Since the detention of the GALLIA GRAECA

20  at Seattle, Angelakos has developed and implemented an enhanced environmental system which

21  not only updated the company's 2013 manual, but now meets the rigorous ISO 14001 standards.

22        The ISO 14001 environmental management standard is an internationally recognized

23  standard which follows a systematic framework to manage the immediate and long-term

24  environmental  impacts  of  an  organization's  products,  services,  and  processes.

25  *See*, www.certificationeurope.com.  In simple terms, it is the 'gold standard' which exists to

26  help organizations to minimize how their operations may impact the environment; enhance

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1    compliance with laws and regulations; and continually improve.  Certification is performed by

2    third party organizations.  The requirements of ISO 14001 are an integral part of Europe's

3    regulatory scheme; a voluntary environmental management instrument which, enables

4    organizations to assess, manage, and continually improve their environmental performance.  It is

5    respectfully submitted that the environmental system in place which meets the ISO 14001

6    standards should be taken into consideration by the Court in evaluating the terms of probation

7    imposed.  A further Environmental Compliance Plan is not warranted in this matter.  However,

8    if the Court wishes to implement some further compliance plan, organizational defendants

9    request that an independent and Court approved special monitor be appointed to assess and

10   review Angelakos' enhanced environmental management system currently in place and be

11   tasked to recommend augmentation as may be necessary and appropriate, if at all.

12                                                **CONCLUSION**

13        For the reasons discussed above, Organizational Defendants request this Honorable

14   Court group the counts of conviction and impose a fine of no more than USD 100,000 in the

15   aggregate.  Alternatively, if the Court were not inclined to group the counts, organizational

16   defendants submit that a joint and several fine of no more than USD 100,000 per count, for a

17   total maximum fine of USD 300,000 be imposed.   Organizational defendants also respectfully

18   submit that no probationary sentence is warranted under the facts and circumstances of this

19   matter.  However, if the Court is inclined to impose a probationary sentence, organizational

20   defendants request that the Court impose a term of probation of no more than two (2) years

21   (with the right to move for early termination of probation consistent with similarly situated

22   APPS cases).[18]  Finally, organizational defendants submit that the implementation of a "new",

23   but not necessarily better compliance plan is unwarranted and, conversely will serve to delay

24   and retard the remedial measures already implemented. If the Court wishes to implement some

25   ───────────────────
     [18] *See e.g.*, *United States v. Kassian Maritime Navigation Ltd.*, 3:07-cr-00048, Dkt. 153 (MDFL Nov. 5,
26   2009)(granting termination of probation after 24 months of 30 month sentence); *United States v. Tyana
     Navigation*, *Limited*, 2:12-cr-290, Dkt. 21 (EDLA June 8, 2015) (granting termination of probation following 30
     months served of 36 month term of probation).

SENTENCING MEMORANDUM - 23
(CR 16-62-JCC)

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

1  further compliance plan, organizational defendants request that a special monitor be appointed

2  to assess and review the environmental management system in place and be tasked to augment

3  as may be necessary and appropriate, if at all.

4       **DATED** this 14th day of October, 2016.

5

6                                    NICOLL BLACK & FEIG PLLC

7
                                     /s/ Jeremy B. Jones_____
8                                    Jeremy B. Jones, WSBA No. 44138
                                     Attorneys for Defendants Angelakos (Hellas) S.A.
9                                    and Gallia Graeca Shipping Ltd.

10
   CHALOS & CO, P.C.
11
   /s/ George M. Chalos_____
12  George M. Chalos, *Lead PHV Counsel*
   Briton P. Sparkman, *PHV Counsel*
13  55 Hamilton Avenue
   Oyster Bay, NY 11771
14  Tel: 516 714 4300
   Fax: 516 750 9051
15  Email:  gmc@chaloslaw.com
           bsparkman@chaloslaw.com
16

17

18

19

20

21

22

23

24

25

26

LAW OFFICES OF
**NICOLL BLACK & FEIG PLLC**
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below, I electronically filed the foregoing with the Clerk of the Court using the CM/CF system which will send notification of such filing to the following:

> ***<u>Attorneys for Plaintiff</u>***
> C. Seth Wilkinson
> Matthew D. Diggs
> U.S. Attorney's Office
> 700 Stewart Street, Suite 5220
> Seattle, WA  98101
> (206) 553-7970
> *Seth.Wilkinson@usdoj.gov*
> *Matthew.Diggs@usdoj.gov*

DATED this 14th day of October, 2016.

> */s/ Jeremy B. Jones*
> Jeremy B. Jones, WSBA No. 44138

LAW OFFICES OF
NICOLL BLACK & FEIG PLLC
1325 FOURTH AVENUE
SUITE 1650
SEATTLE, WASHINGTON 98101
(206) 838-7555